J-A05028-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.B.-M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.M., MOTHER | : | No. 2512 EDA 2023 |

Appeal from the Order Entered September 11, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-DP-0000648-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: M.S.B.-M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.M., MOTHER | : | No. 2513 EDA 2023 |

Appeal from the Decree Entered September 11, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-AP-0000071-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: M.B.-M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.M., MOTHER | : | No. 2514 EDA 2023 |

Appeal from the Order Entered September 11, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-DP-0000642-2016

IN THE INTEREST OF: M.D.B.-M., A   :    IN THE SUPERIOR COURT OF
MINOR                                :         PENNSYLVANIA
                                            :
                                            :

APPEAL OF: J.M., MOTHER          :          No. 2515 EDA 2023

Appeal from the Decree Entered September 11, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-AP-0000072-2022

---

IN THE INTEREST OF: S.B.-M., A   :    IN THE SUPERIOR COURT OF
MINOR                                :         PENNSYLVANIA
                                            :

APPEAL OF: J.M., MOTHER          :          No. 2516 EDA 2023

Appeal from the Order Entered September 11, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-DP-0000649-2016

---

IN THE INTEREST OF: S.J.B.-M., A   :    IN THE SUPERIOR COURT OF
MINOR                                :         PENNSYLVANIA
                                            :

APPEAL OF: J.M., MOTHER          :          No. 2517 EDA 2023

Appeal from the Decree Entered September 11, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-AP-0000073-2022

J-A05028-24

| IN THE INTEREST OF: M.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.M., MOTHER | : | No. 2577 EDA 2023 |

Appeal from the Order Entered September 11, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-DP-0002770-2017

| IN THE INTEREST OF: M.J.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.M., MOTHER | : | No. 2578 EDA 2023 |

Appeal from the Decree Entered September 11, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-AP-0000070-2022

BEFORE: STABILE, J., KING, J., and LANE, J.

MEMORANDUM BY KING, J.: **FILED MAY 30, 2024**

Appellant, J.M. ("Mother"), appeals from the decrees and orders entered in the Philadelphia County Court of Common Pleas, which granted the petitions of the Philadelphia Department of Human Services ("DHS") for involuntary termination of Mother's parental rights to her minor children, M.S.B.-M, M.D.B.-M, S.J.B.-M, and M.J.B. ("Children"), and changed Children's permanency goals to adoption. We affirm.

- 3 -

In its opinion, the trial court fully and correctly set forth the relevant facts and procedural history of this case. (***See*** Trial Court Opinion, filed October 27, 2023, at 1-22). Therefore, we have no reason to restate them. Procedurally, we add that this Court consolidated Mother's appeals *sua sponte* on October 18, 2023.

Mother raises the following issues for our review:

> Did the trial [court] rule in error that [DHS] met its burden of proof that Mother's parental rights to [her] children be terminated.
>
> Did the trial [court] abuse [its] discretion by finding that the [Community Umbrella Agency ("CUA")] made reasonable efforts to reunify.
>
> Did the trial court err in terminating Mother's parental rights since [DHS] did not meet its burden by clear and convincing evidence showing that the best interest of the child was served by terminating Mother's parental rights pursuant to Section 2511(b) of the Adoption Act?
>
> Did the trial [court] rule in error that it was in the child's best interest for the goal to be changed to adoption.

(Mother's Brief at 11-12) (subsections omitted).

Appellate review of termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

***In re Z.P.***, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting ***In re I.J.***, 972 A.2d 5, 8 (Pa.Super. 2009)).

- 4 -

Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).

Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by the finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

*In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191-92 (Pa.Super. 2004).

*In re Z.P., supra* at 1115-16 (quoting *In re Adoption of K.J.*, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Cateria R.

- 5 -

McCabe, we conclude Mother's first three issues merit no relief. The trial court opinion comprehensively discusses and properly disposes of the first three questions presented. (**See** Trial Court Opinion at 23-38) (finding: court terminated Mother's parental rights under 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b); at time of termination hearing, Children had been in care of DHS for over six years, which is well over statutory period specified by Sections 2511(a)(5) and (8); in that time, Mother made only minimal progress towards alleviating conditions that necessitated Children's placement and was only minimally compliant with objectives set forth in single case plan ("SCP"); throughout pendency of case, CUA has continually attempted to provide services and referrals to Mother to assist Mother in progressing towards reunification with Children; concerns over Mother's substance abuse and mental health struggles continued to persist at the time of termination hearing;[1] Mother failed to sign consents or revoked prior consents to permit

_____

[1] Mother claims that the court erred in finding that Mother did not adequately address her substance abuse issues. The court acknowledged that Mother completed a drug and alcohol program but noted that Mother continued to test positive for substances at drug screens. Mother stated that she was prescribed opiates from her dentist at the time of the screen. Nevertheless, Mother's dentist confirmed that had Mother disclosed her history of substance abuse, he would have prescribed her alternate medication. (**See** N.T. Termination Hearing, 9/15/22, at 14-17). Mother also presented testimony from Violet Anderson, a nurse practitioner, who stated that she had seen Mother three or four times between December 2022 and May 2023, and prescribed Mother opiates for pain management to address symptoms that Mother self-reported. (**See** N.T. Termination Hearing, 9/11/23, at 66-81). Ms. Anderson testified that she felt it was appropriate to prescribe Mother
*(Footnote Continued Next Page)*

CUA to confirm her enrollment or progress with substance abuse and mental health treatment; Mother did not progress past supervised visits with Children due to continued concerns about Mother's mental stability and ability to keep Children safe; Mother's visits were suspended for period of time and then changed to virtual visits due to Children's negative reactions to visits and multiple instances where Mother had aggressive outbursts during supervised in-person visits; Mother's failure to timely sign consents for Children to engage in necessary therapeutic, behavioral and educational services prevented or detrimentally delayed Children from receiving services; while Children are aware that Mother is their biological mother, they do not look to Mother to meet their needs nor do they share positive parent-child relationship with Mother; Children are well cared for and bonded with their foster families and have indicated that they wish to be adopted by their foster families[2]).  The record supports the court's decision; therefore, we see no reason to disturb

_____

opiates despite knowing Mother's history of substance abuse due to Mother's diagnosis and level of pain.  Ms. Anderson relied on Mother's self-report that she was no longer abusing controlled substances but acknowledged that she did not have Mother undergo a drug test to confirm Mother's statements prior to issuing her prescription.  (*See id.* at 82-91).  On this record, we cannot say the court abused its discretion in finding that concerns remained regarding Mother's abuse of controlled substances at the time of the termination hearing.  *See In re Z.P., supra*.

[2] Both the guardian *ad litem* ("GAL") and Children's legal counsel opined that Children's interests would best be served by terminating Mother's parental rights.  (*See* N.T. Termination Hearing, 9/11/23, at 283-85).

- 7 -

it.[3] *See In re Z.P., supra*. In light of our decision to affirm the trial court's termination decrees, Mother's fourth issue regarding the court's goal-change orders from reunification to adoption is moot. *See Interest of D.R.-W.*, 227 A.3d 905, 917 (Pa.Super. 2020) (holding that challenge to trial court's decision to change permanency goal from reunification to adoption is moot after this Court affirms termination of parental rights). Accordingly, we affirm the termination decrees based on the trial court's opinion,[4] and affirm the goal-change orders at Mother's appeal from those orders is moot.

Decrees affirmed. Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/30/2024

---

[3] Mother contends the court's findings are not supported by the record because her testimony contradicted testimony from DHS witnesses in multiple areas. Nevertheless, the trial court, as the sole determiner of credibility, found the DHS witnesses to be credible and we decline Mother's invitation to substitute the court's credibility determinations for our own. *See In re Z.P., supra*.

[4] We direct the parties to attach a copy of the trial court's opinion to any future filings involving this appeal.

**IN THE COURT OF COMMON PLEAS**
**FOR THE COUNTY OF PHILADELPHIA**
**FAMILY COURT DIVISION - DEPENDENCY BRANCH**

IN RE:

| | | |
|---|---|---|
| **M.S.B.-M., a minor,** | : | **CP-51-DP-0000648-2016** |
| | : | **CP-51-AP-0000071-2022** |
| **M.D.B.-M., a minor,** | : | **CP-51-DP-0000642-2016** |
| | : | **CP-51-AP-0000072-2022** |
| **S.J.B.-M., a minor,** | : | **CP-51-DP-0000649-2016** |
| | : | **CP-51-AP-0000073-2022** |
| **M.J.B., a minor,** | : | **CP-51-DP-0002770-2017** |
| | : | **CP-51-AP-0000070-2022** |
| | : | |
| | : | **51-FN-000600-2016** |
| | : | |
| | : | **Superior Court No. 2512 EDA 2023** |
| | : | **Superior Court No. 2513 EDA 2023** |
| | : | **Superior Court No. 2514 EDA 2023** |
| | : | **Superior Court No. 2515 EDA 2023** |
| | : | **Superior Court No. 2516 EDA 2023** |
| | : | **Superior Court No. 2517 EDA 2023** |
| | : | **Superior Court No. 2577 EDA 2023** |
| **APPEAL OF: J.M., Mother** | : | **Superior Court No. 2578 EDA 2023** |

**OPINION**

## I.   INTRODUCTION

J.M., ("Mother"), appeals from the Order entered by this Court on September 11, 2023, involuntarily terminating her parental rights as to four of her children: M.D.B.-M., born December 2011, M.S.B.-M., born June 2015, and S.J.B.-M., born September 2013, and M.J.B., born November 2016 (the Children). Testimony for the Goal Change and Termination of Parental Rights Hearings occurred on three hearing dates: September 15, 2022, January 5, 2023, and September 11, 2023, attached hereto as Court's Exhibits A, B, and C, respectively.[1] At the

---

[1] Father, S.B.'s, parental rights were involuntarily terminated on December 6, 2022. At this hearing, it was brought to the Court's attention that Mother retained private counsel, Reginald Allen, Esq. Mr. Allen was unable to proceed that day due to illness. Thus, Mother's portion of the Termination of Parental Rights and Goal Change Hearing was continued on this date and Mr. Allen was ordered enter his appearance within 48 hours. The hearing resumed on January 5, 2023.

1

conclusion of the hearing, the trial court found that clear and convincing evidence existed to involuntarily terminate Mother's parental rights pursuant to the Adoption Act, 23 Pa. C.S.A. §2511(a)(1), (2), (5), (8) and §2511(b) and changed the Children's permanency goals to adoption pursuant to the Juvenile Act, 42 Pa. C.S.A. §6351. For the following reasons, this Court's decision should be affirmed.

## II.    FACTUAL and PROCEDURAL HISTORY

The relevant facts and procedural history of this case are as follows. This family first became involved with the Department of Human Services (DHS) in 2016 due to concerns regarding the safety and welfare of the Children. The Children were adjudicated dependent and committed to DHS on March 24, 2016. They were subsequently reunified with Mother on January 19, 2017, with aftercare services provided by the Community Umbrella Agency (CUA). On July 27, 2017, DHS received a General Protective Services (GPS) report alleging that Mother as well as M.D.B.-M. and S.J.B.-M. were attacked by three woman, one of whom was Father's paramour. The GPS report was determined to be valid. There were also concerns regarding domestic violence as well as Mother's substance abuse, mental health, and housing.

On October 15, 2017, DHS received a GPS report alleging that the Children were being physical abused and neglected by Mother and Father. On October 16, 2017, DHS obtained an Order of Protective Custody (OPC) for the children. When Mother was informed, she fled with the Children before police assistance could arrive. On October 17, 2017, DHS obtained an OPC for the children and placed them in foster care, where they currently remain.

On October 24, 2017, CUA held a revised Single Case Plan (SCP) meeting. The permanency goal for the Children was reunification. The parental objectives for Mother were to comply with dual diagnosis; to comply with medication management; to sign all releases and consents for her and the Children; to comply with the Achieving Reunification Center (ARC) for parenting,

2

domestic violence, anger management, and other appropriate services; to complete three random drug screens, a Clinical Evaluation Unit (CEU) assessment, and monitoring; to obtain stable housing and employment; and to visit the Children at the CUA agency supervised weekly.

On December 5, 2017, the Children were adjudicated dependent based on present inability and committed to DHS. They have remained in DHS care consistently since that time. At the March 19, 2018, initial permanency review hearing, the Court found that Mother was minimally compliant with her SCP objectives. Permanency review hearings were held regularly throughout the case. At each permanency review hearing from 2018 to 2022 when the Goal Change and Termination of Parental Rights Petitions were filed, Mother's compliance with her SCP objectives ranged from minimal to moderate.[2]

On March 13, 2020, Mother underwent a psychological evaluation conducted by Ms. Bernadette Hayburn. She was diagnosed with post-traumatic stress disorder (PTSD), generalized anxiety disorder, and severe, recurrent major depressive disorder. Mother was also diagnosed with cocaine use disorder, phencyclidine (PCP) use disorder, and opioid dependence.

On February 4, 2022, DHS filed petitions to change the goal from reunification to adoption and to involuntarily terminate Mother's parental rights to the Children. The Termination of Parental Rights and Goal Change Hearing (hereinafter the "TPR" hearing) for the Children began on September 15, 2022. Counsel for DHS called their first witness, CUA Case Manager, David Matthews. (N.T. 9/15/2022, p. 7-112 (Exhibit A)). Mr. Matthews testified that he was assigned to this family's case in March 2022. He testified that he maintained the CUA file and that he reviewed the entire file and history. (N.T. 9/15/2022, p. 7 at 13-19 (Exhibit A)). Mr. Matthews testified that this family became known to DHS in March 2016 based on reports of domestic

---

[2] There were also numerous continuances or status listings because Mother was appointed more than six different attorneys throughout the case.

3

violence, inadequate housing, as well as drug and alcohol concerns. Id. at 22-24. He testified that Single Case Plan (SCP) meetings were held on a regular basis throughout the case. (N.T. 9/15/2022, p. 8 at 1-4 (Exhibit A)).

Mr. Matthews testified that Mother's single case plan (SCP) objectives were as follows: (1) address drug and alcohol concerns, complete an assessment at the Clinical Evaluation Unit (CEU), and submit random drug screens; (2) address mental health concerns and medication management; (3) sign all necessary consents and releases for herself and the Children; (4) attend the Achieving Reunification Center (ARC) for parenting, housing, employment, domestic violence, and anger management classes, and (5) comply with court-ordered visitation. (N.T. 9/15/2022, p. 8 at 11-20 (Exhibit A)). He testified that Mother's single case plan objectives remained the same throughout the case. (N.T. 9/15/2022, p. 52 at 20-23 (Exhibit A)). At the September 15, 2022, TPR hearing, Mr. Matthews testified that Mother's compliance with her SCP objectives was minimal. He further testified that Mother made minimal progress to alleviate the circumstances that brought the Children into care. (N.T. 9/15/2022, p. 52 at 24-25; p. 53 at 1-9 (Exhibit A)).

### A. Mother's First Single Case Plan Objective was to Address Drug and Alcohol Concerns and Attend the CEU for Random Drug Screens

Mother was referred for drug and alcohol treatment as well as randoms drug screens at the CEU due to her extensive history of substance use. Mr. Matthews testified that Mother was referred to the CEU for random drug screens throughout the case. (N.T. 9/15/2022, p. 8 at 21-24 (Exhibit A)). Mr. Matthews testified that Mother reported to the CEU on September 6, 2018, following a permanency review hearing and scheduled an appointment for a drug and alcohol assessment on October 1, 2018. The CEU progress report indicated that on October 1, 2018, Mother was a "no call/no show for her scheduled assessment." (N.T. 9/15/2022, p. 9 at 7-22 (Exhibit A)). Mr. Matthews testified that Mother was also sent to the CEU for random drug screens on the

4

following dates. He testified that Mother tested positive for cocaine and PCP on September 7, 2018. (N.T. 9/15/2022, p. 10 at 1-15; p. 11 at 5-7 (Exhibit A)). He further testified that Mother tested negative on September 28, 2018, with a creatinine level of 22. Mother tested positive for PCP on October 24, 2019. Mother also tested positive for benzodiazepines on January 6, 2022. She also testified positive for opiates on May 31, 2022. (N.T. 9/15/2022, p. 11-12; p. 13 at 1-8 (Exhibit A)) (See DHS-1). Mother informed Mr. Matthews that her dentist prescribed her a medication containing opiates following a dental procedure she underwent in May 2022. Mother provided Mr. Matthews with a prescription for the medication. Mr. Matthews contacted mother's dentist for confirmation regarding the prescription. He testified that Mother's dentist was not aware of her substance abuse history. Mr. Matthews stated that if Mother's dentist were aware of Mother's drug and alcohol history, he would have prescribed her an alternative medication. (N.T. 9/15/2022, p. 14 11-25; p. 15 at 1-16 (Exhibit A)).

Mr. Matthews testified that he sent Mother for three random drug screens since he was assigned this case. He further testified that prior CUA Case Managers also attempted to send Mother for random drug screens throughout the case, but Mother failed to attend. (N.T. 9/15/2022, p. 13 at 24-25; p. 14 at 1-3; p. 16 at 6-14 (Exhibit A)). On cross-examination by the Guardian ad Litem (GAL), Mr. Matthews testified that he contacted Mother several times in August 2022 to complete random drug screens. Mother did not attend despite CUA providing transportation passes. (N.T. 9/15/2022, p. 88 at 17-25; p. 89 at 1-3 (Exhibit A). Mother also stated to Mr. Matthews that she would obtain her own random drug screens but never provided CUA with documentation of such drug screens. (N.T. 9/15/2022, p. 89 at 4-11 (Exhibit A)). Mr. Matthews also testified that Mother stated that she completed a drug and alcohol treatment program. However, there was no record of Mother's engagement in or completion of a drug and alcohol program in the CUA case file. (N.T. 9/15/2022, p. 17 at 24-25; p. 18 at 1-9; p. 89 at 12-15 (Exhibit A)).

5

CUA Director, Sakina Gaines also testified at the September 15, 2022, TPR hearing. Ms. Gaines stated that she supervised this case for one year prior to Mr. Matthews being assigned. Ms. Gaines testified that she also attempted to send Mother for random drug screens at the CEU, which Mother never completed. (N.T. 9/15/2022, p. 120 at 11-25; p. 121 at 1-3 (Exhibit A)).

**B.  Mother's Second Single Case Plan Objective was to Address Mental Health Concerns**

Mother was referred for mental health treatment due to continuing mental health concerns. At the September 15, 2022, TPR hearing, Mr. Matthews testified that Mother provided him with information regarding her engagement in mental health treatment that day. He stated that he asked Mother for documentation previously, but that he did not receive it until the day of the TPR hearing. Mr. Matthews testified that Mother provided him with a mental health evaluation dated April 19, 2022, at the TPR hearing. Mr. Matthews also testified that Mother was engaged in a group therapy program at The Wedge Recovery Centers (The Wedge). He stated that the program provided support to assist "Mothers with children and complex issues with housing." (N.T. 9/15/2022, p. 18 at 13-25; p. 19 at 1-7 (Exhibit A)). Mr. Matthews testified that he did not have any additional information regarding Mother's mental health treatment because Mother failed to sign consents. (N.T. 9/15/2022, p. 20 at 10-22 (Exhibit A)).

While Mr. Matthews testified that he was unaware of Mother's mental health diagnosis, the record reflects that Mother underwent a psychological evaluation on March 13, 2020. (N.T. 9/15/2022, p. 20 at 23-25; p. 21 at 9-16 (Exhibit A)). Mr. Matthews testified that prior to the psychological evaluation Mother provided to him at the September 15, 2022, TPR hearing, this was the last psychological evaluation for Mother. (N.T. 9/15/2022, p. 22 at 3-7 (Exhibit A)). Mr. Matthews testified that on March 13, 2020, Mother was diagnosed with posttraumatic stress disorder (PTSD); generalized anxiety disorder; major depressive disorder, recurrent, severe, without psychotic features; opioid dependence, severe, early remission; and cocaine use disorder,

moderate, early remission. (N.T. 9/15/2022, p. 22 at 11-22 (Exhibit A)) (See DHS-2). Mr. Matthews stated that he was unaware whether Mother was prescribed psychotropic medication based on her mental health diagnosis. Id. at 23-25. He reiterated that he was unable to confirm Mother's participation in mental health treatment because Mother failed to sign consents despite numerous attempts by CUA. Mr. Matthews also stated that because Mother failed to sign releases or provide him with her therapist's contact information, he had not been able to discuss Mother's treatment with them or obtain a treatment plan or progress report from Mother's mental health provider. While Mr. Matthews was able to confirm Mother's participation in the complex group therapy program at The Wedge, it was unclear whether this program addressed Mother's specific mental health diagnoses. (N.T. 9/15/2022, p. 23 at 2-25; p. 24 at 1-9 (Exhibit A)). On cross-examination by the GAL, Mr. Matthews further testified that he had no knowledge of whether Mother attended individual therapy at that time to address her mental health concerns. (N.T. 9/15/2022, p. 90 at 16-20 (Exhibit A)).

On September 15, 2022, Mr. Matthews testified that he continued to have concerns regarding Mother's mental health stability. He testified that throughout the case, Mother demonstrated instability in her care of the Children. He also testified that Mother exhibited irrational behaviors which were detrimental to the Children's development. (N.T. 9/15/2022, p. 24 at 10-19 (Exhibit A). He further explained that Mother made threatening calls and sent messages to the Children's foster parents and drove past their homes on several occasions. Mr. Matthews cited an incident on Mother's Day of 2022 in which Mother drove past the foster parent's home shouting obscenities from the car. That same day, Mr. Matthews also received a call from another foster parent of the Children who informed him that the same incident occurred outside their home as well. (N.T. 9/15/2022, p. 24 at 24-25; p. 25 at 1-23; p. 26 at 11-15 (Exhibit A). Mr. Matthews also testified that Mother's mental health concerns and refusal to sign consents for the Children has negatively

impacted their mental health as well as the behavioral and therapeutic services they were supposed to receive. (N.T. 9/15/2022, p. 26 at 16-20; p. 42 at 12-14 (Exhibit A).

Mr. Matthews' testimony was corroborated by CUA Director, Sakina Gaines. On September 15, 2022, Ms. Gaines testified that the main dependency concern for Mother throughout the case has been her mental health instability. She testified that Mother's mental health continued to be a concern due to her recent erratic behaviors and outbursts. She also stated that Mother's mental health negatively impacted the Children's wellbeing. (N.T. 9/15/2022, p. 129 at 1-7; p. 130 at 24-25; p. 131 at 1-2 (Exhibit A)).

C. **Mother's Third Single Case Plan Objective was to Sign the Necessary Consents and Releases**

One of Mother's SCP objectives was to sign consents and releases of information for herself and the Children. On September 15, 2022, Mr. Matthews testified that he asked Mother to sign consents and releases of information on numerous occasions. However, he stated that Mother either refused to sign consents and releases or revoked consents that she previously signed. (N.T. 9/15/2022, p. 42 at 17-20; p. 45 at 14-16; p. 46 at 1-10 (Exhibit A). Mr. Matthews also testified that he was unable to confirm Mother's engagement in mental health services due to her refusal to sign releases of information for her mental health treatment provider. (N.T. 9/15/2022, p. 23 at 2-16; p. 46 at 1-10 (Exhibit A). The testimony reflects that the Children have complex behavioral and therapeutic needs which often required consent from the mother. Mr. Matthews testified that, on numerous occasions, he asked Mother to sign releases of information for the Children's medical records to ensure that they received proper care, as well as consents for Individualized Education Programs (IEP) and for behavioral health services. Mother either refused to sign or revoked previously signed consents. (N.T. 9/15/2022, p. 45 at 17-25 (Exhibit A). Mr. Matthews stated that CUA discussed with Mother the importance of signing consents to allow the Children to receive

the therapeutic and educational services they desperately needed. Mr. Matthews testified Mother's response was that DHS/CUA were "out to get her" and were "attacking her and her family." (N.T. 9/15/2022, p. 41 at 19-25; p. 42 at 1-4 (Exhibit A).

Mr. Matthews further testified that Mother's refusal to sign consents for the Children has negatively impacted their mental health as well as the behavioral and therapeutic services they require. (N.T. 9/15/2022, p. 24 at 21-24; p. 26 at 16-20; p. 42 at 12-14 (Exhibit A). Specifically, Mr. Matthews testified that M.S.B.-M. received behavioral health services through Children's Crisis Treatment Center (CCTC). He testified that while M.S.B.-M. initially made progress in therapy, she began to regress and exhibit behavioral issues. CCTC recommended that M.S.B.-M. receive mental health medication. Mr. Matthews testified that a psychiatric evaluation for M.S.B.-M. was scheduled, but Mother revoked her consent for M.S.B.-M. to receive behavioral health services and refused to sign an updated consent. While Mr. Matthews attempted to obtain the necessary authorization from Mother for M.S.B.-M.'s behavioral services to continue, he was unsuccessful and M.S.B.-M.'s trauma-focused therapy ceased. Mr. Matthews testified that this caused M.S.B.-M.'s behaviors to "decline" and she began to display inappropriate behavioral issues in school and in the foster parent's home. (N.T. 9/15/2022, p. 26 at 23-25; p. 27 at 1-4; p. 29 at 9-25; p. 30 at 1-10; p. 33 at 16-18 (Exhibit A). He further testified that M.S.B.-M.'s lapse in behavioral health services also negatively affected her academic progress. (N.T. 9/15/2022, p. 33 at 19-25; p. 34 at 1-4 (Exhibit A).

Mr. Matthews testified that Mother's refusal to sign consents also negatively affected S.J.B.-M.'s ability to receive the mental health treatment he needed. He testified that in December 2019, S.J.B.-M. presented at the Philadelphia Crisis Response Center (CRC), but Mother refused to sign consents for him to receive treatment because she did not agree with the recommended treatment. Mr. Matthews stated that since then, S.J.B.-M. has continued to exhibit

behavioral issues including acting out violently, biting, kicking, wanting to hurt himself and others, and having suicidal ideations. Mr. Matthews testified that these behaviors resulted in the foster parent taking S.J.B.-M. to the CRC on three occasions since he became the assigned CUA Case Manager. Following one visit, CRC staff recommended that S.J.B.-M. enter a partial stabilization program, for which Mother signed consents. Mother also signed consents for S.J.B.-M. to receive medication but did not agree with the recommended treatment. Mother only consented to a different medication she found through her research. However, Mr. Matthews testified that the medication proposed by Mother was ineffective in treating S.J.B.-M.'s behavioral issues. He further testified that S.J.B.-M was unable to complete the partial stabilization program because his behaviors eventually became so volatile that he was discharged from the partial program prior to completion. Mr. Matthews stated that Mother's intervention in S.J.B.-M.'s mental health treatment has impeded his ability to receive the necessary behavioral health services. (N.T. 9/15/2022, p. 34 at 11-25; p. 35-36; p. 37 at 1-4 (Exhibit A).

Mr. Matthews also testified that Mother's refusal to sign consents for S.J.B.-M.'s services and medication has also negatively affected his education. (N.T. 9/15/2022, p. 37 at 24-25; p. 38 at 1-3 (Exhibit A). S.J.B.-M.'s school recommended that he receive an IEP for therapeutic support. While Mother agreed to the IEP during the IEP meeting, she failed to sign consent forms for the IEP to be implemented. (N.T. 9/15/2022, p. 37 at 24-25; p. 38 at 1-10 (Exhibit A). Mr. Matthews also testified that because S.J.B.-M. did not receive an IEP for therapeutic support in school, he had issues socializing at school and frequently acted out violently towards other students. (N.T. 9/15/2022, p. 39 at 24-25; p. 40 at 1-21 (Exhibit A).

Mother's refusal to sign consents for the Children to receive treatment continued to be an issue at the September 11, 2023, conclusion of the TPR hearing. At that hearing, Mr. Matthews testified that CUA contacted Mother to sign consents for M.D.B.-M. to receive therapeutic services. Mother

eventually signed the consent form, but it was too late. M.D.B.-M. was placed on a waiting list further delaying her access to necessary therapeutic services. (N.T. 9/11/2023, p. 12 at 19-25; p. 13 at 1-17 (Exhibit C)).

## D. Mother's Fourth Single Case Plan Objective was to Attend ARC to Address Parenting, Housing, Employment, Domestic Violence, and Anger Management Concerns

At the September 15, 2022, TPR hearing, Mr. Matthews testified that Mother completed parenting, domestic violence, and anger management classes through ARC. Mr. Matthews also testified that Mother had appropriate housing but had not provided documentation regarding whether her rent and utility bills were up to date. Mr. Matthews further testified that while he spoke to Mother's previous employer, she was unemployed at the time. (N.T. 9/15/2022, p. 45 at 4-25; p. 46 at 1-11 (Exhibit A).

## E. Mother's Fifth Single Case Plan Objective was to Comply with Court Ordered Visitation

When the Children were adjudicated dependent in December 2017, Mother's visits were supervised at the CUA agency. However, they were changed from supervised at CUA to supervised at DHS for increased security due to Mother behaviors and outbursts toward CUA staff. (N.T. 1/5/2023, p. 158 at 4-13; p. 162 at 12-17 (Exhibit B)). Mother's visits remained supervised at the CUA agency until the June 25, 2019, Permanency Review Hearing. At that hearing, the Court temporarily suspended Mother's visits with three of the Children, M.S.B.-M., M.D.B.-M., and S.J.B.-M. The Court found that Mother's visits were detrimental to the Children and that they displayed defiant behaviors following visits with Mother. The Court further ordered that Mother's visits could be reinstated once therapeutic visits were in place. Mother's visits with M.J.B. were ordered to be supervised at DHS. (See Trial Court Order 6/25/19). Mother's visits with the Children were reinstated at the January 21, 2020, Permanency Review Hearing. At that point, the Court ordered that Mother was to have monthly visits with the Children and that the visits were to

11

be supervised at DHS. The Orders for all four Children stated: "if Child's behavior becomes negative, visits will be suspended." (See Trial Court Order 1/21/20). At the December 6, 2021, permanency review hearing, Mother's visits with M.S.B.-M., M.D.B.-M., and S.J.B.-M. were changed to supervised weekly. These visits were ordered to occur virtually. Mother's visits with M.J.B. remained in-person, supervised weekly at DHS. (See Trial Court Order 12/6/21). Prior court orders reflect that Mother's visits remained the same at the start of the TPR hearing on September 15, 2022.

At the September 15, 2022, TPR hearing, Mr. Matthews testified that Mother's visits at DHS stopped following several incidents involving Mother's behavior. Mr. Matthews testified that the Children's foster parents informed him that Mother took pictures of them and their vehicles without their consent. Subsequently, the foster parents had to use an alternate entrance in the back of DHS so that Mother would not "see them coming." Mr. Matthews also testified that the family attended a family function therapy session, but that the session ended due to Mother's erratic behaviors. Mr. Matthews also testified about an incident during a visit at the CUA agency. Mother held the Children after the visit and would not release them. He testified that the police were called to intervene. The Children were escorted out the back of the building to avoid Mother. The Children left safely with their respective foster parents. (N.T. 9/15/2022, p. 46 at 22-25; p. 47 at 1-9 and 18-25; p. 48 at 1-2 (Exhibit A). Mr. Matthews also testified that there had been issues with Mother's visitation as recently as June 2022 due to her aggressive behaviors. Mr. Matthews testified that Mother "acted out" again during a visit at DHS in June 2022 between Mother, M.J.B., and a younger sibling. Following that visit, Mr. Matthews testified that DHS sent a letter to CUA stating that Mother could no longer visit with the Children at DHS as her behaviors presented a safety concern to their staff. Thus, Mother's visits were changed to virtual. (N.T. 9/15/2022, p. 48 at 3-9 (Exhibit A); (N.T. 1/5/2023, p. 29 at 9-11; p. 37 at 16-17; p. 38 at 1-3 and 21-24 (Exhibit

12

B)). On January 5, 2023, CUA Case Aid, Taylor Johnson testified that since the June 2022, incident, Mother did not confirm visits with the Children from June to September 2022. She stated that Mother was consistent with her visits since October 2022 and no further incidents were reported. (N.T. 1/5/2023, p. 39 at 17-24; p. 40 at 1-14 (Exhibit B)).

CUA Director, Ms. Gaines, also testified on September 15, 2022, regarding the June 2022 incident that occurred at DHS during a visit between Mother and M.J.B. The testimony reflected that Mother attempted to give M.J.B. a temporary tattoo against the Child's wishes. Although M.J.B. consistently stated that he did not want a tattoo, Mother proceeded to put the tattoo on him, which upset the Child. The situation escalated and M.J.B. became fearful, which caused the visit to end. DHS security was called to deescalate the situation. Following the incident, M.J.B. stated to the CUA Case Aid who supervised the visit that he was scared and thought they were going to leave him with Mother. (N.T. 9/15/2022, p. 125; p. 126 at 1-17 (Exhibit A).

Ms. Gaines' testimony was corroborated by CUA Case Aid, Taylor Johnson, who testified during the January 5, 2023, TPR hearing. Ms. Johnson testified that she began supervising Mother's visits in December 2021. (N.T. 1/5/2023, p. 29 at 9-11; p. 35 at 9-11 (Exhibit B)). She testified that she was supervising Mother's visit with M.J.B. when the June 2022 tattoo incident occurred. Ms. Johnson testified that the incident began when M.J.B. did not want Mother to give him a temporary tattoo because he stated he was going to get into trouble with his foster parent. Ms. Johnson testified that Mother then grabbed M.J.B.'s arm and stated, "Well, I'm your mom, and I say you can have them." Mother also asked M.J.B. if he was being abused by his foster parent, and Mother became upset when M.J.B. nodded his head "a little bit." She indicated that the incident escalated quickly. Ms. Johnson stated that M.J.B. was crying and reaching out for her, but Mother was holding him behind her back and keeping him from her. She testified that M.J.B. then stated to her, "Please don't leave me. I'm scared." Ms. Johnson further testified that a DHS

13

worker ended the visit, and Mother got into a verbal altercation with them. At that time, Ms. Johnson grabbed M.J.B. and escorted him out of DHS through the back exit. She testified that M.J.B. was crying and shaken up, but that he stated he was "scared, but brave." Since that incident, Ms. Johnson stated that M.J.B. no longer wishes to visit with Mother and is afraid of her. (N.T. 1/5/2023, p. 29 at 22-25; p. 30 at 3-5; p. 31-34; p. 35 at 19-20; p. 37 at 3-13; p. 169 at 2-8 (Exhibit B)).

CUA Case Aid, Anaies Mangum, testified on January 5, 2023, and corroborated Ms. Johnson's account of the June 2022 incident. Ms. Mangum testified that during the incident, she observed Mother holding M.J.B. "hostage" in a room with the door closed and not letting him out. It was her opinion that M.J.B. appeared scared during the incident. Ms. Mangum also testified that after she and Ms. Johnson were able to remove M.J.B. from the situation, M.J.B. stated to them, "I was scared, and I didn't want you to leave me." (N.T. 1/5/2023, p. 149-150 (Exhibit B)). M.J.B. also stated to her that he did not want to visit Mother anymore after the June 2022 incident. (N.T. 1/5/2023, p. 152 at 20-25 (Exhibit B)).

Since the June 2022 incident, Mr. Matthews testified that CUA attempted to facilitate virtual visits between Mother and M.J.B., but that he was unaware of the quality of those visits. (N.T. 9/15/2022, p. 48 at 18-19 (Exhibit A). Mr. Matthews testified that since the June 2022 incident, M.J.B. has stated to him that he does not want to see Mother and that he "definitely does not want to go back to DHS to see mom." (N.T. 9/15/2022, p. 50 at 5-11 (Exhibit A). Mr. Matthews also testified that following the June 2022 incident, M.J.B. reported being scared of Mother, feeling unsafe around her. He also pleaded with CUA not to send him back to Mother. (N.T. 9/15/2022, p. 110 at 10-22 (Exhibit A). Mr. Matthews' testimony was corroborated by CUA Case Aids, Ms. Johnson and Ms. Mangum, who both testified on January 5, 2023, that M.J.B. has refused

14

visits with Mother following the June 2022 incident because he is scared. (N.T. 1/5/2023, p. 29 at 22-25; p. 30 at 3-5; p. 35 at 19-20; p. 42 at 3-5; 152 at 20-25 (Exhibit B)).

Mr. Matthews further testified that since the June 2022 incident, Mother has not visited with M.S.B.-M. (N.T. 9/15/2022, p. 48 at 14-17 (Exhibit A). He stated that CUA attempted to facilitate in-person visits between them, but that the in-person visits were detrimental to M.S.B.-M. Mr. Matthews testified that following visits with Mother, M.S.B.-M. began to act out in a volatile manner, which included cutting and scratching herself as well as other inappropriate behaviors. As a result, M.S.B.-M. stopped visiting with Mother. (N.T. 9/15/2022, p. 49 at 20-25; p. 50 at 1-4 (Exhibit A). CUA Case Aid, Taylor Johnson, also testified on January 5, 2023, that following a virtual visit with Mother, M.S.B.-M. reported feeling scared because she thought she was going home with Mother and did not want to. (N.T. 1/5/2023, p. 35 at 21-25; p. 36 at 1-2 and 13-15 (Exhibit B)).

Regarding the quality of M.D.B.-M.'s visits with Mother, Mr. Matthews testified that she and Mother continue to have virtual visits. (N.T. 9/15/2022, p. 50 at 12-15 (Exhibit A). He testified that the visits go "fairly well", but that there was little engagement between M.D.B.-M. and Mother until Mother offered to give her money. (N.T. 9/15/2022, p. 50 at 21-25; p. 51 at 8-11 (Exhibit A). Mr. Matthews further testified that the last time M.D.B.-M. visited with Mother was in June 2022, and that M.D.B.-M. has never expressed a desire to see Mother. (N.T. 9/15/2022, p. 54 at 8-24 (Exhibit A)). Mr. Matthews' testimony regarding M.D.B.-M.'s visits with Mother was corroborated by CUA Case Aid, Taylor Johnson, who supervised the visits. During the January 5, 2023, TPR hearing, Ms. Johnson testified that while M.D.B.-M. visited with Mother virtually, she appeared to be annoyed during the visits. Ms. Johnson also testified that the visits usually did not last longer than 25-30 minutes and that Mother often ended the visits early. (N.T.

1/5/2023, p. 47 20-23; p. 48 at 7-20 (Exhibit B)). She stated that M.D.B.-M. is not sad when Mother's visits ended. (N.T. 1/5/2023, p. 49 at 5-7 (Exhibit B)).

Finally, Mr. Matthews testified that Mother has had virtual visits with S.J.B.-M. since June 2022, and that he communicates with Mother through a cell phone she bought him. (N.T. 9/15/2022, p. 48 at 19-24 (Exhibit A). Mr. Matthews also testified that Mother informed him that she had unauthorized contact with the S.J.B.-M. despite this Court's order that any visitation is to be supervised and virtual due to the negative behaviors S.J.B.-M. exhibited after visits with Mother. (N.T. 9/15/2022, p. 51 at 12-25; p. 52 at 1-11 (Exhibit A).

Mr. Matthews testified that Mother's visits remained supervised throughout the case and were not expanded due to safety concerns regarding Mother. (N.T. 9/15/2022, p. 49 at 11-20 (Exhibit A). Additionally, Mother's visits were moved from the CUA agency to DHS for more enhanced security due to Mother's behaviors and outbursts. However, after numerous incidents regarding Mother exhibiting erratic behaviors during visits, DHS informed CUA that Mother could no longer visit at DHS. They indicated that Mother's negative behaviors presented safety concerns for their staff. (N.T. 9/15/2022, p. 48 at 3-9 (Exhibit A). Thus, Mr. Matthews stated that Mother's visits with all four Children were virtual at the time of the September 15, 2022, TPR hearing. Mr. Matthews further testified that he believed it was in the Children's best interest for Mother's visits to remain virtual to ensure their safety. (N.T. 9/15/2022, p. 49 at 11-20 (Exhibit A). The testimony from CUA Case Aids, Anaies Mangum and Taylor Johnson, reflects that throughout their respective supervision of the case since 2019, there have been numerous issues regarding Mother's visits as well as inconsistency by Mother. Ms. Mangum and Ms. Johnson also testified that throughout the case, the Children typically do not appear happy to visit Mother and they are not sad when the visits end. (N.T. 1/5/2023, p. 49 at 5-7; p. 148 at 10-13; p. 153 at 10-23 (Exhibit B)). The CUA Case Aids also testified that in their supervision of the case, they have not observed

any parent-child bond between Mother and the Children. (N.T. 1/5/2023, p. 59 at 10-14; p. 153 at 1-23 (Exhibit B)).

### F. Mother's Relationship and Bond with M.D.B.-M.

At the September 15, 2022, TPR hearing, Mr. Matthews testified that there would not be any irreparable harm to M.D.B.-M. if Mother's rights were terminated. He testified that it would be in her best interest for Mother's parental rights to be terminated so that she can be freed for adoption. (N.T. 9/15/2022, p. 54 at 25; p. 55 at 1-14 p. 78 at 10-17; p. 82 at 16-18 (Exhibit A)). Mr. Matthews stated that M.D.B.-M. and Mother do not share a parent-child bond. Mr. Matthews also testified that Mother has not visited with M.D.B.-M. since June 2022. He stated that M.D.B.-M. never asks about Mother and has never expressed a desire to see her. (N.T. 9/15/2022, p. 53 at 10-15; p. 54 at 8-24 (Exhibit A)).

In contrast, Mr. Matthews testified that M.D.B.-M. has resided with her foster parent since approximately 2018 and shares a parent-child bond with her. (N.T. 9/15/2022, p. 81 at 7-22 (Exhibit A)). He testified that the foster parent is a pre-adoptive resource for M.D.B.-M. (N.T. 9/15/2022, p. 82 at 8-9 (Exhibit A)). M.D.B.-M. is thriving in the foster parent's home, and they meet all of her needs. Mr. Matthews also testified that M.D.B.-M. looks to her foster parent to meet her basic needs as well as her educational, emotional, and medical needs. The foster parent also provides M.D.B.-M. with love, support, care, and comfort. (N.T. 9/15/2022, p. 55 at 6-10; p. 69 at 6-7 at 8-19; p. 81 at 22-25; p. 82 at 1-7 (Exhibit A)). Mr. Matthews further testified that M.D.B.-M. and her foster parent have a great relationship and described the relationship as loving, caring, nurturing, and fun. (N.T. 9/15/2022, p. 81 at 10-18 (Exhibit A)).

When Mr. Matthews asked M.D.B.-M. about permanency, she expressed that she wished to either remain living with her current foster parent or to reside with one of her siblings' foster parents. (N.T. 9/15/2022, p. 55 at 11-14 (Exhibit A)). On cross-examination by the TPR Child

Advocate, Mr. Matthews also testified that M.D.B.-M. expressed a desire to remain in the foster parent's home on a permanent basis. (N.T. 9/15/2022, p. 98 at 18-20 (Exhibit A)). Mr. Matthews' testimony was corroborated by the TPR Child Advocate's witness, Social Worker Roya Paller, who testified during the September 11, 2023, TPR hearing. Ms. Paller testified that she spoke to M.D.B.-M. about permanency on March 20, 2023, and September 10, 2023. Ms. Paller testified that M.D.B.-M. is 11 years old, and that she has resided with this foster parent since 2017. Ms. Paller explained the difference between Permanent Legal Custody (PLC) and adoption to M.D.B-M. She testified that M.D.B.-M. understood the meaning of adoption and was clear that she wished to be adopted by her foster parent. Ms. Paller also stated that M.D.B.-M. is bonded to her foster parent and that the foster parent meets her daily, basic needs. She explained that the foster parent also ensures that M.D.B.-M. visits with her siblings. Regarding adoption, Ms. Paller testified that M.D.B.-M. had no concerns about severing her relationship with Mother because she does not see Mother on a consistent basis. Ms. Paller also testified that Mother's inconsistent visitation has caused M.D.B.-M. to feel let down and disappointed. When Ms. Paller spoke to M.D.B.-M. about permanency again on September 10, 2023, M.D.B.-M. maintained her position that she wished to be adopted and expressed frustration that adoption had not yet occurred. (N.T. 9/11/2023, p. 46-48; p. 51 at 1-22 (Exhibit C)).

### G. Mother's Relationship and Bond with M.S.B.-M. and M.J.B.

At the September 15, 2022, TPR hearing, Mr. Matthews testified that M.S.B.-M. and M.J.B. are placed in the same foster home. (N.T. 9/15/2022, p. 84 at 21-24; p. 95 at 4-6 (Exhibit A)). They have resided with their foster parent since December 2021 and the foster parent is a pre-adoptive resource for them. (N.T. 9/15/2022, p. 84 at 10-11 and 25; p. 85 at 1-2 and 20-21 (Exhibit A)). At the September 15, 2022, TPR hearing, Mr. Matthews testified that that there would not be any irreparable harm to M.S.B.-M. or M.J.B. if Mother's rights were terminated. (N.T. 9/15/2022,

p. 56 at 12-15; p. 58 at 9-12 (Exhibit A)). He further testified that it would be in their best interest for Mother's parental rights to be terminated so that they can be freed for adoption. (N.T. 9/15/2022, p. 78 at 10-17; p. 86 at 3-5 (Exhibit A)).

Regarding M.S.B.-M.'s relationship with Mother, Mr. Matthews testified that he has never observed any connection between her and Mother and she does not share a parent-child bond with Mother. He stated that M.S.B.-M. had not visited with Mother since June 2022 and that the visits they did have were detrimental and resulted in behavioral issues which necessitated CCTC therapy. (N.T. 9/15/2022, p. 55 at 15-25; p. 56 at 1-3 (Exhibit A)). Mr. Matthews further testified that M.S.B.-M. never asked about Mother and did not express a desire to see her. (N.T. 9/15/2022, p. 56 at 4-11 (Exhibit A)). In contrast, Mr. Matthews testified that M.S.B.-M. resided with her foster parent since December 2021 and that they are bonded. M.S.B.-M. looks to her foster parent to meet her basic needs as well as her educational, emotional, and medical needs. The foster parent provides her with love, support, care, and comfort. (N.T. 9/15/2022, p. 85 at 1-19 (Exhibit A)).

Regarding M.J.B.'s relationship with Mother, Mr. Matthews testified that while there may be a bond between M.J.B. and Mother, M.J.B. has been consistent that he no longer wishes to visit or see Mother as a result of the June 2022 incident at DHS. (N.T. 9/15/2022, p. 50 at 5-11; p. 56 at 16-21; p. 58 at 4-17 (Exhibit A)). In contrast, Mr. Matthews testified that M.J.B. has resided with his foster parent since December 2021, and that he calls her "mama." He stated that they have a great relationship and are bonded. M.J.B. looks to his foster parent to meet his basic needs as well as his educational, emotional, and medical needs. The foster parent provides him with love, support, care, and comfort. (N.T. 9/15/2022, p. 83 at 14-25; p. 84 at 1-9 (Exhibit A)).

On cross-examination by the TPR Child Advocate, Mr. Matthews also testified that both M.S.B.-M. and M.J.B. expressed a desire to remain in the foster parent's home permanently. (N.T. 9/15/2022, p. 98 at 14-17 and 21-24 (Exhibit A)). Mr. Matthews' testimony was corroborated by

19

the TPR Child Advocate's witness, Social Worker Roya Paller. During the September 11, 2023, TPR hearing, Ms. Paller testified that she spoke to M.D.B.-M. and M.J.B. about permanency on March 20, 2023, and September 10, 2023. M.D.B.-M. and M.J.B. reside in the same home. Ms. Paller testified that when she spoke to M.S.B.-M. and M.J.B. about permanency on March 20, 2023, they understood the meaning of adoption and wished to be adopted by their foster parent. She testified that M.S.B.-M. and M.J.B. were bonded to their foster parent, were happy in the home, and looked to the foster parent to meet their basic needs. Ms. Paller also expressed that the foster parent facilitated visitation between M.S.B.-M., M.J.B., and their siblings. When Ms. Paller spoke to M.S.B.-M. about permanency again on September 10, 2023, she expressed that she no longer wished to visit Mother and refused visitation. When Ms. Paller spoke to M.J.B. about permanency again on September 10, 2023, he expressed frustration regarding the length of the adoption process and why he has not been adopted yet. (N.T. 9/11/2023, p. 51 at 23-25; p. 52; p. 53 at 1-4; p. 55 at 20-25; p. 56 at 1-19 (Exhibit C)).

**H.  Mother's Relationship and Bond with S.J.B.-M.**

At the September 15, 2022, TPR hearing, Mr. Matthews testified that S.J.B.-M. recognized Mother as his mother, spoke to her often, and cared about her. (N.T. 9/15/2022, p. 58 at 18-23 (Exhibit A). However, Mr. Matthews testified that while S.J.B.-M. has stated he wished to return to Mother's care, he was not hopeful that she would ever be in a place where she was able to care for him. (N.T. 9/15/2022, p. 58 at 23-25; p. 59 at 1-8 (Exhibit A). Mr. Matthews testified that there would not be any irreparable harm to S.J.B.-M. if Mother's rights were terminated because he understood that Mother's concerning behaviors needed to be addressed before reunification could occur. (N.T. 9/15/2022, p. 59 at 19-25; p. 60 at 1-4 (Exhibit A). Mr. Matthews testified that while S.J.B.-M. may be bonded with Mother and cares for her, they do not share a positive bond. He testified that S.J.B.-M.'s behavioral issues are escalated following visits or contact with Mother.

(N.T. 9/15/2022, p. 58 at 21-23; p. 60 at 12-25 (Exhibit A). Mr. Matthews testified that it would be in S.J.B.-M.'s best interest for Mother's parental rights to be terminated so that he can be freed for adoption. (N.T. 9/15/2022, p. 78 at 10-17; p. 82 at 16-18; p. 87 at 9-11 (Exhibit A)).

Mr. Matthews testified that S.J.B.-M. has been in care since he was four years old. (N.T. 9/15/2022, p. 110 at 4-9 (Exhibit A). He stated that S.J.B.-M.'s behavioral issues impacted his prior placements. At the time of the TPR hearing, S.J.B.-M. was in a stable placement where he was thriving and receiving the care and attention he needed. (N.T. 9/15/2022, p. 37 at 5-22; p. 75 at 20-23 (Exhibit A). Mr. Matthews also testified that although S.J.B.-M. has only resided in his current placement since September 2022, the foster parent is a pre-adoptive resource for him. (N.T. 9/15/2022, p. 86 at 21-23 (Exhibit A).

On cross-examination by the TPR Child Advocate on September 15, 2022, Mr. Matthews testified that S.J.B.-M. wished to reside with Mother. However, he also stated to Mr. Matthews that he was "open to the idea of adoption" if reunification was not viable. (N.T. 9/15/2022, p. 57 at 23; p. 100 at 1-6 (Exhibit A). Mr. Matthews' testimony was corroborated by the TPR Child Advocate's witness, Social Worker Roya Paller. During the September 11, 2023, TPR hearing, Ms. Paller testified that she spoke to S.J.B.-M. about permanency on March 20, 2023. Ms. Paller testified that S.J.B.-M. struggled the most of all the Children throughout his time in foster care. She expressed that when S.J.B.-M. came into care, he was acting out and was not behaviorally stable. However, since being placed in his latest foster home, he was stable, and Ms. Paller saw a "100 percent turnaround" in his behavior. When Ms. Paller spoke to S.J.B.-M. about permanency in March 2023, he understood the meaning of adoption, and expressed that he wished to be adopted and to remain in his foster home. She testified that stability was very important for S.J.B.-M. Ms. Paller stated that S.J.B.-M. understood that adoption could mean a severance of visitation with Mother and Father, and that S.J.B.-M. was "fine with that." She further testified that S.J.B.-M.

21

experienced trauma and disappointment due to Mother's inconsistent visitation and expressed that he had no wishes regarding future contact with Mother at that time. (N.T. 9/11/2023, p. 53 at 12-25; p. 54; p. 55 at 1-19 (Exhibit C)).

On September 11, 2023, this Court involuntarily terminated Mother's parental rights to the Children, M.S.B.-M., M.D.B.-M., S.J.B.-M, and M.J.B., pursuant to 23 Pa. C.S.A. §2511(a)(1), (2), (5), and (8). In accordance with 23 Pa. C.S.A. §2511(b), this Court found that termination of Mother's parental rights best served the developmental, physical, and emotional needs and welfare of the Children. Mother filed a Notice of Appeal and a Concise Statement of Errors Complained of on Appeal as to M.S.B.-M, M.D.B.-M., and S.J.B.-M on October 2, 2023. Mother filed a Notice of Appeal as Concise Statement of Errors Complained of on Appeal as to M.J.B. on October 10, 2023.[3]

## III.    STATEMENT OF MATTERS COMPLAINED ON APPEAL

In the Pa. R.A.P. 1925(b) Concise Statement of Matters Complained of on Appeal regarding the Order changing the Children's permanency goals to adoption as well as the Order Terminating Mother's Parental Rights, the Appellant identifies the following issue(s):

1. The Judge ruled in error that the Philadelphia City Solicitor's Office met its burden of proof to terminate Mother's parental rights.

2. The Judge ruled in error that it would be in the best interest and/or termination would best serve the needs of the child.

3. The Judge ruled in error that the City met its burden that the goal should be change to adoption.

4. The Judge ruled in error that the CUA agency made reasonable efforts to reunify.

---

[3] Counsel for Mother filed three separate Notices of Appeal on October 2, 2023, one for each of the Children as to the TPR and Goal Change to Adoption. Counsel for Mother filed a separate Notices of Appeal for M.J.B. on October 10, 2023. Mother's Notices of Appeal state essentially the same errors for each child. The matters are related and arise out of the same facts and circumstances. Thus, a single submission from the Trial Court is most appropriate to avoid duplication.

## IV. STANDARD OF REVIEW

The proper standard of review when considering a trial court's determination of a petition to terminate parental rights is abuse of discretion. This standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re R.J.T.*, 608 Pa. 9 A.3d 1179, 1190 (2010). "An abuse of discretion is not merely an error of judgment; if, in reaching a conclusion, the court overrides or misapplies the law, or the judgment exercised is shown by the record to be either manifestly unreasonable or the product of partiality, prejudice, bias or ill will, discretion has been abused." *Bulgarelli v. Bulgarelli*, 934 A.2d 107, 111 (Pa. Super. 2007). Additionally, in order to affirm, an appellate court need only agree with the trial court as to any one subsection of § 2511(a), as well as § 2511 (b). *In re B.L.W.*, 843 A. 2d 380, 384 (Pa. Super. 2004).

Our standard of review of dispositional orders in juvenile proceedings is settled. The Juvenile Act grants broad discretion to juvenile courts in determining appropriate dispositions. *In re C.A.G.*, 89 A.3d 704, 709 (Pa. Super.2014). Indeed, the Superior Court will not disturb the lower court's disposition absent a manifest abuse of discretion. *In the Interest of J.D.*, 798 A.2d 210, 213 (Pa. Super. 2002). Appellate review of a weight of the evidence claim is limited to a review of the judge's exercise of discretion. See *Commonwealth v. Widmer*, 689 A.2d 211 (Pa. 1997), and *Commonwealth v. Brown*, 648 A.2d 1177, 1189-1192 (Pa. 1994).

## V. DISCUSSION

### A. The Trial Court Properly Found that DHS met its Burden by Clear and Convincing Evidence to Terminate the Parental Rights of Mother Pursuant to 23 Pa. C.S.A. §2511(a)(1), (2), (5), and (8)

Mother alleges in her Concise Statement of Matters Complained of on Appeal, that this Court erred when it found that there was clear and convincing evidence that Mother's parental rights should be terminated. This Court disagrees.

Under Pennsylvania law, the burden of proof is on the party seeking termination of parental rights to establish, by clear and convincing evidence, the existence of grounds for termination. *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003). It is well established that courts must examine the circumstances of each case and consider all explanations provided by the parent facing involuntary termination of his or her parental rights "to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination." *Id.* Clear and convincing evidence has been defined as testimony by credible witnesses who clearly relate facts that are so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction without hesitance of the truth of precise facts in issue. *In Interest of J.M.*, 166 A.3d 408, 427 (Pa. Super. 2017) (citing *In re Novosielski*, 992 A.2d 89, 107 (Pa. 2010)).

This Court found that grounds for involuntarily termination of Mother's parental rights existed pursuant to 23 Pa. C.S.A. §2511(a)(1), (2), (5), and (8) and §2511(b). This Court will address each subsection separately.

## 1. This Court Properly Terminated Mother's Parental Rights Pursuant to §2511(a)(1) of the Adoption Act

With respect to 23 Pa. C.S.A. §2511(a)(1), Pennsylvania law provides that the rights of a parent may be involuntarily terminated after a petition has been filed if:

> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties. 23 Pa. C.S.A. §2511(a)(1).

Under these facts and circumstances, this Court found clear and convincing evidence that Mother demonstrated a settled purpose of relinquishing parental claim to the Children and failed to perform her parental duties. The Children have been in DHS care continuously since an OPC was obtained in October 2017. The record reflects that M.D.B.-M. has resided with her current

24

foster parent since approximately 2018. M.S.B.-M. and M.J.B. have resided in the same foster home since December 2021. S.J.B.-M. has resided in his current foster home since September 2022. Mother's failure to perform parental duties since the Children's placement was demonstrated by her failure to fully or substantially comply with her SCP objectives prior to the filing of the petition to terminate her parental rights in February 2022. At the September 15, 2022, TPR hearing, CUA Case Manager, Mr. Matthews, testified that Mother was minimally compliant with her SCP objectives, and had made minimal progress to alleviate the circumstances which brought the Children into care. Throughout the case, Mother's compliance with her SCP objectives and her progress towards reunification never advanced beyond moderate.

Mother has an extensive substance use and mental health history. While Mother completed a drug and alcohol program at Gaudenzia in March 2022, she has since tested positive for substances during random CEU drug screens. Mother also did not complete the Gaudenzia drug treatment program until after the filing of the TPR petitions. While Mr. Matthews testified that in his opinion, Mother should be engaged in a drug and alcohol program, the record reflects that Mother is not currently in any drug and alcohol program. Mother also underwent a psychological evaluation in March 2020. Her mental health diagnoses at that time included PTSD, generalized anxiety disorder, and major depressive disorder. The testimony reflects that Mother was engaged in group therapy at The Wedge. However, Mr. Matthews has not been able to confirm her participation or speak to Mother's therapist due to Mother's refusal to sign consents and releases for her mental health treatment. Similarly, Mr. Matthews has also been unable to obtain a treatment plan or progress report from The Wedge or any other mental health provider. Thus, it is unclear whether The Wedge has full picture of Mother's mental health history and whether the group therapy program addresses Mother's specific diagnoses. Additionally, Mr. Matthews testified that because of Mother's inconsistent mental health treatment and erratic behaviors, he continued to have

25

concerns regarding Mother's mental stability. Mr. Matthews also testified despite completing a parenting and anger management course, he still had concerns due to her persistent irrational behaviors. The testimony also reflects that that Mother's refusal to sign consents for the Children has negatively impacted their mental health and impeded their behavioral and therapeutic services.

Mother's visits have remained supervised throughout the case and have never been expanded to unsupervised due to concerns regarding Mother's mental stability and ability to keep the Children safe. Since the Children came into care in 2017, Mother has not visited consistently, which has caused the Children frustration and disappointment. Mother's visits initially began supervised at the CUA agency. However, due to Mother's aggressive behaviors and outbursts, the visits were moved to DHS for increased security. Following an incident during a visit at DHS in June 2022, DHS informed CUA that Mother could no longer visit with the Children at DHS due to safety concerns. Thus, Mother's visits were changed to virtual for their safety and wellbeing. Since the start of the TPR hearing on September 15, 2022, M.S.B.-M. and M.J.B. have refused visits with Mother. M.S.B.-M. has exhibited detrimental behavioral issues following visits with Mother. M.J.B. indicated that he was fearful of Mother following the June 2022 visit and no longer wished to visit her. M.D.B.-M. and S.J.B.-M. at times have virtual visits with Mother. However, the testimony reflects that there is little engagement between Mother and M.D.B.-M. and that Mother often ends the visits early.

Fully complying with her objectives would have demonstrated Mother's interest in caring for the Children. However, prior to the filing of the TPR petitions in February 2022, Mother made minimal effort to fulfill these objectives. Mother has had more than six years to complete her SCP objectives and achieve reunification, which is much longer than the statute requires. She has failed to do so in that time. Accordingly, this Court found that termination of Mother's parental rights was warranted pursuant to §2511(a)(1).

## 2. This Court Properly Terminated Mother's Parental Rights Pursuant to §2511(a)(2) of the Adoption Act

When terminating parental rights pursuant to §2511(a)(2), the moving party must prove by

clear and convincing evidence:

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
> 23 Pa. C.S.A. §2511(a)(2).

This ground for termination is not limited to affirmative misconduct. It may include acts of

refusal to perform parental duties but focuses more specifically on the needs of the child. *In re*

*Adoption of C.A.W.*, 683 A.2d 911, 914 (Pa. Super. 1996). Section 2511(a)(2) of the Adoption Act

focuses on the child's present and future need for essential parental care, control, or subsistence

necessary for their physical or mental well-being. *In re Adoption of M.J.H.*, 501 A.2d 648, 654

(Pa. Super. 1985). Even if a parent demonstrated love for their child or makes efforts to perform

their duties, if a parent's incapacity cannot be remedied, their parental rights may be terminated.

*Id.*

Applying §2511(a)(2) to this case, it is clear that DHS met its burden of demonstrating that

termination of Mother's parental rights and changing the Children's goals to adoption was proper.

The Children were brought into care in October 2017 based on concerns regarding Mother's

substance abuse, mental health, domestic violence, and parenting capacity. Mother's incapacity

under §2511(a)(2) exists in that Mother failed to demonstrate a concrete desire or ability to remedy

the conditions that led to the Children's placement. Mother has an extensive history of substance

use and mental health issues. Since completing a drug and alcohol program at Gaudenzia in 2022,

she has tested positive for substances. Mother is not currently engaged in a drug and alcohol

program despite CUA Case Manager, Mr. Matthews' recommendation for treatment. While

Mother enrolled in a group therapy session at The Wedge, it is unclear whether she engaged in individual therapy to address her specific mental health diagnoses. Mr. Matthews also expressed that he still had concerns regarding Mother's mental health stability due to her inconsistent treatment and aggressive and irrational behaviors. CUA also had concerns regarding Mother's mental health treatment at The Wedge due to Mother's refusal to sign mental health releases allowing CUA to obtain Mother's treatment plan and progress report. Mother's aggressive and threatening behavior continue to be a concern despite her completion of anger management and parenting. As a result, Mother's visits remain supervised for the Children's safety and have never progressed further. Due to a June 2022 incident during a visit at DHS that threatened the safety of the Children and DHS staff, Mother's visitation has been virtual. The record reflects that Mother did not consistently visit throughout the case, often ended the visits early, and that some of the Children refused visits and exhibited behavioral issues after visits with Mother.

Mother's incapacity is also demonstrated by her failure to sign the necessary consents and releases for the Children's treatment. As a result, the Children experienced lapses in their behavioral and therapeutic services or have not been able to engage in services at all. M.S.B.-M. was previously engaged in CCTC trauma therapy. However, the services stopped because Mother revoked the consent for her to receive treatment. As a result, there was regression in M.S.B.-M.'s progress and her behavioral issues began to resurface. Mother's refusal to sign consents has also negatively affected S.J.B.-M.'s ability to receive the mental health treatment he needed. S.J.B.-M. has presented at the Crisis Response Center (CRC) on three occasions since Mr. Matthews was assigned the case in March 2022. His behavioral issues include acting out violently, biting, kicking, and suicidal ideations. S.J.B.-M was also forced to leave a partial stabilization program prematurely because his behaviors eventually became too volatile to control. On multiple occasions, Mother refused to sign consents for him to receive treatment because she did not agree

28

with the recommended treatment or medication. Mother's intervention in S.J.B.-M.'s mental health treatment has impeded his ability to receive necessary behavioral health services. Additionally, Mother refused to sign a consent for S.J.B.-M.'s IEP to be implemented, which caused S.J.B.-M.'s behavioral issues in school to worsen. Mother's refusal to sign consents for the Children to receive treatment continued to be an issue at the September 11, 2023, TPR hearing. The testimony reflected that M.D.B.-M. recently required therapeutic services but was placed on a waiting list because Mother did not sign the necessary consents in time. The Children have complex behavioral and therapeutic needs, which have been impeded by Mother's refusal to sign consents for services to be implemented. Mother's refusal to consent to therapeutic services for the Children has also negatively impacted their mental health.

This Court found that Mother's failure to fully or substantially comply with her SCP objectives throughout the case left the Children without the essential parental care, control, and subsistence necessary for their physical or mental well-being, and the cause of such neglect, refusal, and continued incapacity would not be remedied by Mother. The Children have been in DHS care since 2017. They have spent over six years outside of the care and control of Mother. Mother's compliance with her SCP objectives ranged from moderate to minimal throughout the case. There has not been sufficient progress made to reunify the Children with Mother. For these reasons, the Court found that clear and convincing evidence existed to justify the involuntary of Mother's parental rights pursuant to §2511(a)(2).

### 3. This Court Properly Terminated Mother's Parental Rights Pursuant to §2511(a)(5) and (8) of the Adoption Act

As the requirements for terminating parental rights under §2511(a)(5) and (8) are similar, this Court will address them simultaneously. To terminate parental rights pursuant to §2511(a)(5), the petitioner must prove that:

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child. 23 Pa. C.S.A. §2511(a)(5).

DHS, as a children and youth agency, is not required to extend services beyond the period of time deemed as reasonable by the legislature. A child's life cannot be put on hold in hope that the parent will summon the ability to handle the responsibilities of parenting. *In re J.T.*, 817 A.2d 505, 509 (Pa. Super. 2001). The Pennsylvania Superior Court has recognized that a child's needs and welfare require agencies to work toward termination of parental rights when a child has been placed in foster [kinship] care beyond reasonable temporal limits and after reasonable efforts for reunification by the agency have been ineffective. *In re N.W.*, 859 A.2d 501, 508 (Pa. Super. 2004).

In order to terminate parental rights under §2511(a)(8), the petitioner must prove that:

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child. 23 Pa. C.S.A. §2511(a)(8).

Unlike §2511(a)(5), termination under §2511(a)(8) does not require an evaluation of a parent's willingness or ability to remedy the conditions that initially led to placement. *See In re Adoption of R.J.S.*, 901 A. 2d 502, 511 (Pa. Super. 2006) (citations omitted).

In the instant case, this Court determined that DHS satisfied the requirements of Sections §2511(a)(5) and (8). M.D.B.-M. was born on December     2011, and is 11 years old. S.J.B.-M. was born on September     2013, and is 10 years old. M.S.B.-M. was born on June     2015, and

is 8 years old. M.J.B. was born on November ___ 2016, and is 6 years old. The Children have been in care continuously since an OPC was obtained on October 17, 2017. They have spent over six years outside of the care and control of Mother. The record reflects that M.D.B.-M. has resided with her current foster parent since approximately 2018. M.S.B.-M. and M.J.B. have resided in the same foster home since December 2021. S.J.B.-M. has resided in his current foster home since September 2022. The conditions that led to the Children's placement included Mother's substance abuse, mental health, housing, parenting capacity, and ability to keep the Children safe. SCP objectives were established for Mother to reunify with the Children. Since the Children have been in placement, Mother has made minimal progress to alleviate the circumstances that brought the Children into care despite attempts by CUA to facilitate reunification. CUA Case Manager, Mr. Matthews testified at the September 15, 2022, TPR hearing that throughout the case, Mother was minimally compliant with her SCP objectives and made minimal progress toward reunification. The Children have been in foster care for over six years, which is an inordinate amount of time and is much longer than the statutory period requires for permanency.

When the TPR hearing began on September 15, 2022, Mr. Matthews expressed concerns regarding Mother's mental health, substance use, anger management, and parenting capacity. When the TPR hearing concluded on September 11, 2023, these concerns continued to exist. The conditions that brought the Children into care continue to exist and are not likely to be remedied within a reasonable time. While Mother engaged in a group therapy program at The Wedge, it is unclear whether she takes mental health medication or if the program addressed her specific mental health diagnoses. CUA has also been unable to confirm Mother's treatment at The Wedge or any other mental health provider and has been unable to obtain a treatment plan and progress report because Mother refused to sign releases for her mental health treatment. Mother's mental health stability has also been questioned due her threatening and erratic behaviors toward CUA and DHS

31

staff, the Children's foster parents, as well as courtroom observation. While Mother completed an anger management course, she continues to display aggressive and erratic behaviors, which CUA attributes to Mother's mental health issues. Mother's mental health has also had a negative impact on the Children's mental health. Her refusal to sign consents has also negatively impacted their engagement in the necessary therapeutic, behavioral, and educational services. As a result, some of the Children have experienced lapses in their services or have been unable to receive services at all.

There have also been numerous issues and incidents during Mother's visits throughout the case, which continued to exist as recent as Mother's last in-person visit in June 2022. Mother's supervised visits with the Children were moved from CUA to DHS for increased security due to Mother's behaviors. However, following an incident in June 2022, which M.J.B. observed, Mother's visits changed to virtual for the safety of the Children and DHS staff. Mother's visitation never progressed beyond supervised, she was inconsistent with visitation throughout the case, and the testimony reflects that Mother currently ends virtual visitation early. Visitation with Mother has also had a detrimental impact on the Children, specifically M.S.B.-M. and M.J.B. They are currently refusing visits. While M.D.B.-M. and S.J.B. may visit Mother virtually at times, the testimony reflects that there is little engagement, and that the conversation is superficial. The CUA Case Aids also testified that they have not observed a parent-child bond between the Children and Mother during their supervision of Mother's visits throughout the case.

The evidence reflects that while there has been some compliance by Mother to complete her SCP objectives, there has not been enough progress to enable reunification of the Children with Mother. Mother has failed to complete her SCP objectives to alleviate the need for placement. As a result, Mother will not remedy the conditions that led to the Children's placement within a reasonable time. The Children deserve permanency and should not wait indefinitely. Moreover,

the evidence clearly established that termination would best serve the needs and welfare of the Children. The Children are well-adjusted, happy, and thriving in their respective foster homes. They are bonded to their foster parents who they look to for safety and stability. They look to their foster parents to meet their basic needs as well as their emotional, therapeutic, and educational needs. Thus, this Court properly terminated Mother's parental rights pursuant to both §2511(a)(5) and (8).

**B.** **The Trial Court Properly Found that it Would be in the Best Interest of the Children to Terminate the Parental Rights of Mother Pursuant to §2511(b)[4]**

Having found that the statutory grounds for termination of Mother's parental rights have been satisfied pursuant to 23 Pa. C.S.A. §2511(a), this Court further found that termination of Mother's parental rights serves the best interests of the Children pursuant to §2511(b).[5]

Under §2511(b), the party seeking termination of parental rights must prove by clear and convincing evidence that termination is in the best interest of the child. *In re Bowman*, 436 Pa. Super. 647 A.2d 217, 218 (1994). In determining the best interest of the child, courts must consider both the needs and welfare of the child such as love, comfort, security, and stability. *Id.* See also *In re Adoption of T.T.B.*, 835 A.2d 387, 397 (Pa. Super. 2003). Furthermore, the parent-child relationship is examined in order to determine what effect the potential termination would have on the child. *In re K.Z.S.*, 946 A.2d 753, 760 (Pa. Super. 2008). Typically, when examining the nature of the parent-child relationship, courts must consider whether there is a natural bond between the

---

[4] **23 Pa. C.S.A. § 2511(b). Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

[5] *See In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) ("Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second of the analysis pursuant to Section 2511(b)").

33

child and parent, and if termination of parental rights would sever "an existing, necessary, and beneficial relationship." *Id.* At 761. In assessing the parental bond, the trial court is permitted to rely upon the observations and evaluations of social workers. In cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *Id.* at 762-63.

Section 2511(b) of the Adoption Act contains evidentiary limitations. The last sentence sets forth an exclusion clause which states, "With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." In *In re D.W.*, the Court held that this exclusion clause within §2511(b) barred the trial court from considering mother's post-petition conduct. *In re D.W.*, 856 A.2d 1231, 1234 (Pa. Super. 2004). Based on the evidentiary limitations set out in §2511(b), this Court is not obligated to consider any efforts made by Mother to remedy the conditions that led to the Children's placement that were first initiated after Mother was given notice that the petition to terminate her parental rights had been filed.

Based on the evidence, this Court determined that the Children would not suffer any irreparable harm if Mother's parental rights were terminated. They have been in DHS care continuously since October 2017. M.D.B.-M. has resided with her foster parent since approximately 2018. M.S.B.-M. and M.J.B. have resided in the same foster home since December 2021. S.J.B.-M. has resided in his current foster home since September 2022. The Children are currently eleven, ten, eight, and six years old and have spent over six years outside of the care and control of Mother. There was compelling testimony presented at the TPR hearing that while the Children know that J.M. is their biological Mother, they do not share a positive parent-child bond with her. The Children's behavioral issues are escalated following visits or contact with Mother. Mother has not consistently visited the Children throughout the case, which has caused them disappointment and

34

frustration. The Children do not look forward to visiting with Mother, are not sad when visits end, and never ask about Mother or express a desire to see her. Mother's visits with the Children continue to be supervised and have never been unsupervised due to concerns that Mother is unable to keep them safe. Additionally, Ms. Paller testified that during her conversations with the Children about permanency, the Children understood the meaning of adoption, and did not express any concerns regarding the severance of visitation with Mother.

In determining the best interest of the child, this Court must consider both the needs and welfare of the child such as love, support, care, and comfort. The Children do not look to Mother to meet these needs. Instead, the Children look to their respective foster parents to provide them with love, support, care, and comfort. They also look to their foster parents to meet their basic needs as well as for safety and stability. The foster parents, not Mother, have attended to the Children's emotional and educational needs needs throughout the case. The Children are happy and well-adjusted in their respective foster homes. Their respective homes are pre-adoptive placements for the Children. When Mr. Matthews spoke to the Children about permanency, they all expressed a desire to remain in their respective foster homes permanently. Additionally, the Children's foster parents ensure that sibling visits occur so that they can maintain a relationship despite residing in different homes. For these reasons, Mr. Matthews testified that it would be in the Children's best interest for Mother's parental rights to be terminated so that the Children can be freed for adoption.

Social Worker, Roya Paller, corroborated Mr. Matthews' testimony. She spoke to the Children about permanency in March 2023 and September 2023. When she spoke to M.D.B.-M. in March 2023, she observed that M.D.B.-M. was bonded with her foster parent and that the foster parent provided for all her needs. She testified that M.D.B.-M. understood the meaning of adoption and was clear that she wished to be adopted by her foster parent. When Ms. Paller spoke to

M.D.B.-M. about permanency again in September 2023, M.D.B.-M. maintained her position that she wished to be adopted and expressed frustration that adoption had not occurred.

M.S.B.-M. and M.J.B. reside in the same foster home. Ms. Paller also spoke to them about permanency in March 2023. She testified that they understood the meaning of adoption and wished to be adopted by their foster parent. Ms. Paller testified that M.S.B.-M. and M.J.B. were bonded to their foster parent, were happy in the home, and looked to the foster parent to meet their basic needs. When Ms. Paller most spoke to them about permanency again in September 2023, they stated that they did not want to visit Mother and expressed frustration regarding the length of the adoption process.

S.J.B.-M.'s behavioral issues have impacted his prior placements. However, since September 2022, he has resided in a stable placement where he is thriving and receiving the care and attention he needs. When Ms. Paller spoke to S.J.B.-M. about permanency in March 2023, he understood the meaning of adoption, and expressed that he wished to be adopted and remain in his foster home. Ms. Paller further testified that S.J.B.-M. experienced trauma and disappointment due to Mother's inconsistent visitation and he expressed that he had no wishes regarding future contact with Mother.

Clear and convincing evidence has been presented to establish that there would be no irreparable harm caused to the Children if this Court terminated Mother's parental rights. The Children have been in care for over six years. They deserve permanency and should not wait indefinitely. For these reasons, this Court properly found that it would be in the best interests of the Children to grant DHS's petition to terminate the parental rights of Mother pursuant to §2511(b) and for the Children's permanency goals to be changed to adoption.

## C. The Trial Court Properly Found that DHS/CUA made Reasonable Efforts to Reunify the Children with Mother

Mother alleged in her Concise Statement of Matters Complained of on Appeal that this Court erred in finding that DHS/CUA made reasonable efforts to reunify the Children with Mother. This Court disagrees.

Testimony regarding reasonable efforts was elicited at each hearing prior to the TPR hearing that began on September 15, 2022. At each hearing, the Court made findings regarding the reasonable efforts made to provide services to help Mother remedy the conditions that brought the Children into DHS care and to facilitate reunification with Mother. The Court found that DHS/CUA made reasonable efforts to place the Children with kin and to reunify the Children with Mother. The court orders from prior listings consistently reflect that reasonable efforts were made to finalize the permanency plan.

At the TPR hearings on September 15, 2022, January 5, 2023, and September 11, 2023, the Court heard testimony regarding Mother's compliance with her SCP objectives, progress toward alleviating the circumstances that brought the Children into care, as well as reasonable efforts. At the TPR hearings, this Court heard testimony from the CUA Case Manager assigned to Mother's case, the CUA Case Aids who supervised Mother's visits, as well as the CUA Director of Case Management. They were directly involved in providing services and referrals to facilitate reunification with Mother. CUA Case Management Director, Ms. Gaines, also testified at the September 15, 2022, TPR hearing that Permanency Specialists were assigned to assist Mother in achieving reunification with the Children. Referrals were made throughout the case for various programs such as drug and alcohol, mental health, and the Achieving Reunification Center (ARC) for appropriate reunification services. CUA also held numerous SCP meetings throughout the case to discuss the objectives that Mother needed to complete to reunify with the Children. Mother's

SCP objectives remained the same. and Mother attended the SCP meetings inconsistently. CUA has offered Mother assistance throughout the case, but Mother has been resistant to complying with CUA.

It is apparent to this Court that although referrals and services were provided to assist Mother in achieving reunification with the Children, Mother has failed to take advantage of these services. The evidence reflected that although Mother completed some of her SCP objectives, progress has not been made to enable reunification with Mother. Mother's assertion that this Court erred in finding that reasonable efforts were made to facilitate reunification is meritless.

## VI.   **CONCLUSION**

For these reasons, this Court respectfully requests that the Order dated September 11, 2023. Terminating Mother's Parental Rights and changing the Children's permanency goals to adoption be AFFIRMED.

BY THE COURT:

Date: October 26, 2023

Cateria R. McCabe, Judge

38

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing OPINION has been filed and served upon the following parties, as set forth below:


**PACFILE**

**Guardian Ad Litem:**
Claire Leotta, Esquire
3331 Guilford Street
Philadelphia, PA 19136

**Child Advocate:**
William A. Calandra, Esquire
1615 Jackson Street
Philadelphia, PA 19145

**Counsel for Mother:**
Jeffrey C. Bruch, Esquire
1515 Market St., Suite 1200
Philadelphia, PA 19102

**Trial Counsel for DHS:**
Luisa Garcia, Esquire
Law Department, Child Welfare Unit
1515 Arch Street, 16th Floor
Philadelphia, PA 19102

**Appellate Counsel for DHS:**
Kathleen Bola Kim, Esquire
Law Department, Child Welfare Unit
1515 Arch Street, 16th Floor
Philadelphia, PA 19102

**Appellate Counsel for DHS:**
Robert D. Aversa, Esquire
Law Department, Child Welfare Unit
1515 Arch Street, 16th Floor
Philadelphia, PA 19102

Date

Cateria R. McCabe, Judge